IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| MITCHELL O. PICKENS, et al, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 04-0678-CV-W-HFS |
| ) | |
| ANGELA WASSON-HUNT, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

Before the court is the motion for summary judgment filed by defendants Angela Wasson-Hunt, Jim Wilson, Mayor Kay Barnes, Karl Zobrist and Javier M. Perez, collectively referred to as "the Board[1];" Michael Wood, Owen J. Farris, Michael L. Glass, Scott Selock, Keith M. Ericsson, and Eric J. Roeder[2].

On August 5, 2004, plaintiffs, Mitchell O. Pickens and Tameka Hutchinson, filed a complaint against defendants alleging excessive force under 42 U.S.C. § 1983 against defendant board members in their official capacities for failure to properly train and supervise "six unknown members of the Police Department of Kansas City" and the remaining defendants were sued in their individual capacities. Plaintiffs also asserted state law claims of conversion, battery, and assault

---

[1] Members of the Board of Police Commissioners of Kansas City, Missouri.

[2] In an amended complaint filed on April 3, 2005, plaintiffs noted that defendants Hunt, Wilson, Barnes, Zobrist, and Perez are being sued in their official capacities as members of the Board. Defendants Wood, Farris, Glass, Selock, Ericsson, and Roeder are being sued in their individual capacities as police officers working for the Board.

against the defendant police officers. In the amended complaint, plaintiffs refined their allegations, and included the names of the formerly unknown officers.

Plaintiffs assert federal question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs also invoke this court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## I. Background Facts

On August 6, 2002, Pickens was visiting friends at 2524 Quincy and was asleep in a bedroom; Hutchinson resided at that location with her mother. (Amended Complaint: ¶¶ 16-17). In the early afternoon, Pickens was awakened by an overweight African American male with braids in his hair knocking at the door. Pickens answered the door, and the man asked him for a man with "braids." (Id: ¶ 18). After shouting obscenities, the man left, and shortly thereafter defendant police officers Wood, Farris, Glass, Selock, Ericcson, and Roeder forcibly entered the residence. (Id: ¶ 19).

Plaintiffs state that the officers did not knock and announce themselves before entering the residence. (Id: ¶ 20). Pickens was awakened by yelling and when he walked into the living room he was confronted by the officers who told him to get on the ground; he complied with the order and attempted to explain that he had fusion surgery on his back. (Id: ¶ 24). He also advised the officers that he was a private security officer and had an unloaded, licensed gun in another room. (Id). Hutchinson testified that she too was ordered to lie down, and when the officers observed her dog, a pit bull, she was then ordered to hold the dog or it would be shot. (Id: ¶ 21). Hutchinson states that the dog was not acting in an aggressive manner, but, rather, was cowering in fear. (Id: ¶ 22). As he lay on the floor, Pickens had trouble breathing with his face straight down on the floor, but the

2

officers refused to let him turn his head to the side. (Id: ¶ 25). While on the ground, Pickens states that he was kicked and struck by the officers' hands and feet, and felt a blunt object on his head, back, and legs. (Id: ¶ 26). His face was smashed into the floor, and three of his teeth were broken; his right hand and arm were twisted in an unnatural manner resulting in a tear to his right rotator cuff. (Id). While conducting a search of the residence, the officers took family photographs, Hutchinson's 9 mm High Point Rifle, and Pickens' 9 mm handgun. (Id: ¶¶ 29-30).

Pickens asserts that defendant officers Wood, Farris, Glass, Selock, Ericsson, and Roeder used excessive force in violation of the Fourth Amendment by kicking, grabbing and twisting his arm, jumping on his back, and smashing his face into the ground. (Amended Petition: ¶ 33). He also asserts that Wood, while acting in a supervisory capacity, intentionally failed to properly supervise defendants Farris, Glass, Selock, Ericsson, and Roeder while they engaged in the aforementioned behavior. (Id: ¶ 34). Pickens asserts that defendant board members Hunt, Barnes, Zobrist and Perez had exclusive control of the policies of the Board of Police Commissioners and failed to properly train and supervise Wood, Farris, Glass, Selock, Ericsson, and Roeder. (Id: ¶¶ 35-37).

Defendants have moved for summary judgment, and claim that Pickens' excessive force claim fails because he cannot identify which officer used excessive physical force against him. (Suggestions in Support: 12). Defendants also argue that the officers were serving a search warrant in a drug-infested area and only used minimal force to subdue a suspect. (Id: pg. 13). In support of this argument, defendants rely on a videotape purportedly showing that Pickens was not seriously injured and was not lying on the floor. Defendants also contend that Pickens' injuries consisting of loss of a tooth and a torn rotator cuff were sustained "after his failure to comply with the officers' orders." (Id).

3

Defendants further claim that even if excessive force is found, Pickens' claim still fails because the officers are shielded by qualified immunity.

**II. <u>Analysis</u>**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Lawyer v. City of Council Bluffs, Iowa</u>, 240 F.Supp.2d 941, 945 (S.D.Iowa 2002); <u>quoting</u>, Fed.R.Civ.P. 56 ( c ). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Daniels v. Downing</u>, 2003 WL 252114 (D.Minn. 2003); <u>quoting</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56 (e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." <u>Daniels</u>, at *2; <u>quoting</u>, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. <u>Id</u>; <u>citing</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

A. **Qualified Immunity**

Qualified immunity shields governmental officials from personal liability if their actions, even if unlawful, were "nevertheless objectively reasonable in light of the clearly established law at the time of the events in question." Coleman v. Rieck, 253 F.Supp.2d 1101, 1106 (D.Neb. 2003). The inquiry should focus on whether plaintiffs have asserted a violation of a clearly established constitutional right and, if so, whether there are genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right. Coleman, at 1106. Under circumstances such as these, the court must consider the threshold question of whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the officers' conduct violated a constitutional right. Id.; citing, Saucier v. Katz, 533 U.S. 194, 200 (2001). If no constitutional right would have been violated even if the allegations were established, there is no necessity for further inquiries concerning qualified immunity. Id. The second inquiry, whether the right was clearly established at the time, must be undertaken in light of the specific context of the case, not as a broad general proposition. Id.

B. **Excessive Force**

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000); quoting, Graham v. Connor, 490 U.S. 386, 394 (1989). "[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth and Eighth Amendments. Wilson, at 715; quoting, Graham, at 394. The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-

force claims that "arise[] in the context of an arrest or investigatory stop of a free citizen," while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences. Id.

Claims that law enforcement officers have used excessive force during the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard. Kuha v. City of Minnetonka, 365 F.3d 590, 597 (8th Cir. 2003). Although not capable of precise definition or mechanical application, proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Kuha, at 597. Analysis of the reasonableness standard is actually a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. Id.

Reasonableness of the particular force used must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and it must allow for the fact that police officers are often forced to make split-second judgments under circumstances that are tense, uncertain, and rapidly evolving. Kuha, at 597. Thus, the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances surrounding them, without regard to their underlying intent or motivation[3]. Id.

---

[3]In other words, an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. Kuha, at 597.

6

The evidence, viewed in the light most favorable to Pickens, would be that he did not resist arrest, did not attempt to flee, and did not pose a threat to the officers or others. He obeyed every order, even when lying down caused pain to his back[4], and kept his face to the floor even when this position restricted his breathing. Nevertheless, he was kicked, beaten, and punched, resulting in injuries which included the loss of a tooth and a rotator cuff tear.

Plaintiffs state, and defendants do not refute, that upon entry to the residence the officers did not wear identification badges on their outermost clothing. After securing the premises and all of the occupants, the evidence also reveals that upon shedding their vests and helmets, and re-entering the residence, identification badges were not worn. Pickens says he was able to subsequently identify, by distinguishing physical characteristics, Officers Glass, and Selock, as the officers who physically assaulted him, and Officer Wood as the supervising officer who stood by and failed to intercept the beating. (Suggestions in Opposition: Ex. I, pgs. 6-7, 25-28, 36-38).[5]

Similarly inconclusive is defendants' reliance on a videotape that purportedly shows Pickens sitting comfortably in a chair while the search was taking place. (Suggestions in Support: pg. 9, ¶ 15). The initial span of the camera shows two women sitting on the floor restrained, and Pickens sitting in a chair, similarly restrained. (Defense: Ex. 3). The camera merely flashes by these occupants,

---

[4]Defendant attempts to equate Pickens' plea to the officers about the fusion surgery to his back with resisting arrest, and seems to suggest that the officers were compelled to "subdue" him. (Suggestions in Support: pg. 13). This argument is unpersuasive, for the record, including testimony given by the officers, as well as police reports filed, is devoid of any compelling evidence that Pickens resisted or failed to obey the officers' commands. Simple attempts at communication and to warn of possible personal injury could not reasonably be equated with obstructive conduct.

[5]Whether the evidence can adequately establish that the two large officers, acting together, inflicted injury, and that Officer Glass knocked out a tooth, are issues best left to trial.

7

leaving little time for the viewer to assess injuries, if any. The second viewing clearly shows Pickens still sitting restrained in a chair, but with his head hanging down toward his chest arguably in distress. (Id).

In sum, Pickens has presented enough proof in support of his claim that a jury could properly find that the degree of force used against him was not "objectively reasonable." Kuha, at 597. Moreover, it would have been clear to reasonable officers that conduct consistent with the claim was unlawful at the time, and in the situation they confronted. Coleman, 253 F.Supp.2d at 1107; citing, Saucier v. Katz, 533 U.S. 194, 201-02 (2001). Thus, qualified immunity is not applicable to Officers Glass and Selock. However, the remaining officers are entitled to judgment on the excessive force claim because the evidence establishes that these officers used no force. Coleman, at 1108.

Plaintiffs correctly note, however, defendants' failure to address Pickens' claim of failure to supervise as alleged against Officer Wood. In response, defendants merely state that in the event the claims against the other officers fail either substantively or because of qualified immunity, the claim for supervisory liability would fail as well. (Reply Brief: pg. 4). This is insufficient to show that there is no genuine issue of material fact regarding this claim[6]. Defendants therefore, fail to meet their burden and summary judgment will be denied.

As to the Board, defendants argue that as held in Smith v. State, 152 S.W.3d 275 (Mo.banc 2005), suit against the board members in their official capacities is barred by the Eleventh Amendment which shields them with sovereign immunity. In their opposition papers, plaintiffs

---

[6]The Eighth Circuit has determined that police officers have a duty to intervene in the unconstitutional behavior of fellow officers, and a failure to do so may be actionable under § 1983. Madison v. City of Minneapolis, 2004 WL 1630953 * 6 (D.Minn. 2004); citing, Putnam v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981).

8

concede this point[7]. Additionally, defendants have submitted evidence demonstrating that there was adequate training and supervision. This consists of an affidavit signed by Deputy Chief Rachel H. Whipple, in which she avers that the Board had a policy in effect for the Kansas City, Missouri police department, and the street narcotics unit, dealing with the appropriate manner to execute a search warrant. (Suggestions in Support: Ex. 4). She also averred that the defendant officers were trained in conducting entries, including no-knock entries. (Id).

As previously noted, plaintiffs do not dispute defendants' argument, but, rather, concede this point, in reliance on Smith. As such, plaintiffs fail to meet their burden, and summary judgment on this issue will be granted to defendants named as members of the Board.

## C. State Law Claims

### Conversion

Plaintiffs, Pickens and Hutchinson, have raised claims of conversion regarding firearms removed from the residence which, despite repeated requests, have not been returned. Plaintiffs assert

---

[7]There has been significant discussion as to whether police boards in St. Louis and/or Kansas City are sufficiently under State control so as to be considered an arm of the State. see, Auer v. Robbins, 519 U.S. 452 (1997) (finding that although four of the five members of the board are appointed by the Governor, the *City of St. Louis* is responsible for the board's financial liabilities, thus, it is not an arm of the state immune from suit). Similar results occurred regarding the Kansas City Board in Gorman v. Easley, 257 F.3d 738, 745 (8th Cir. 2001); rev'd on other grounds, Barnes v. Gorman, 536 U.S. 181 (2002). This decision has been recently upheld in Thomas v. St. Louis Bd. of Police Com'rs, 447 F.3d 1082 (8th Cir. 2006), which determined that the board was not an agency of the State, and, therefore, not protected by Eleventh Amendment immunity. Thomas, at 1085. The Thomas court recognized that recent developments in Missouri law may be eroding the Eleventh Amendment analyses of Auer and Gorman, i.e. legislative changes limiting the state's financial obligations, and state statutes defining the character of boards, however, the Thomas court found Auer to be binding. Thomas, 447 F.3d at 1085-86.

9

this claim against Officers Wood, Farris, Glass, Selock, Ericsson, and Roeder. "Conversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." Audio Odyssey, Ltd. v. Brenton First Nat. Bank, 284 F.Supp.2d 1159, 1180 (S.D.Iowa 2003).

The videotape reveals that officers located a 9 mm caliber rifle and a 9 mm semi-automatic handgun in different bedrooms at the residence. (Defense Ex. 3). Both officers stated on the video, and police officer protocol requires, that these items be removed from the home and placed in police custody. (Suggestions in Support: Ex. 4, pg. 5-7); see also, (Suggestions in Opposition: Selock Depo.Ex. E, pg. 12; Glass Depo. Ex. F, pg. 10-13).

Pickens testified, and defendants do not dispute that at some point during the home invasion, he and another male occupant were directed by the officers to go outside to a van parked outside. (Suggestions in Opposition: Ex. I, pg. 24). It is Pickens' belief that an unidentified informant sat inside the van for identification purposes, but did not identify either Pickens or the other male as participants in unlawful activity; thus, they were told to "go back into the house and stay there fifteen minutes. Don't move until we're gone." (Id). In his affidavit, Pickens avers that due to his work as an armed guard, he has been licensed by the Private Officer Licensing Section of the Board of Police Commissioners of Kansas City, Missouri. (Suggestions in Opposition: Ex. K, ¶ 6). During his deposition, Pickens testified that he has requested the return of his firearm on four occasions, and each time was told that the report could not be located, or the gun could not be found, or that it would not be returned to him. (Id: Ex. I, pg. 34-44).

Defendants do not dispute that the firearms were recovered by officers at the scene, and they do not dispute that the firearms have not been returned. However, they argue that they are immune

10

from suit pursuant to official immunity and the Public Duty Doctrine. Official immunity shields public officers and state officials from civil liability for injuries arising out of their *discretionary* acts, functions, or omissions performed in the exercise of their official duties. Harris v. Munoz, 43 S.W.3d 384, 387 (Mo.App.W.D. 2001). However, it does not operate to shield public officers from civil liability for injuries arising out of their negligent performance of merely *ministerial* acts and functions in the exercise of their official duties. Harris, at 387.

Generally speaking, *discretionary* acts, for purposes of official immunity, involve the exercise of reason in developing a means to an end, and the employment of judgment to determine how or whether an act should be performed or a course pursued. Harris, at 387. By contrast, a *ministerial* function is one that "a public officer is required to perform 'upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to [the officer's] own judgment or opinion concerning the propriety of the act to be performed.'" Id; quoting, Charron v. Thompson, 939 S.W.2d 885, 886 (Mo.banc 1996). Whether a function is *discretionary* or *ministerial* is a case by case determination to be made after weighing "such factors as the nature of the official's duties, [and] the extent to which the acts involve policymaking or the exercise of professional expertise or judgment." Id.

The facts of the case at bar are quite similar to those set forth in Jungerman v. City of Raytown, 925 S.W.2d 202 (Mo.banc 1996). The plaintiff in Jungerman, was arrested and detained by the Raytown police. Jungerman, at 204. After being transported to the police station, and placed in the booking area, his possessions were taken; this included about $1,171 and a gold Rolex watch. Id. The plaintiff left the police station the next morning, but his watch was missing. Id.

11

Department policy required the arresting officer to hand plaintiff's effects to a booking officer who was to immediately inventory, record, and store them in a property bag. Id. However, the evidence revealed that plaintiff's property was placed in an open wooden box on a counter accessible to the public for about 45 minutes; other discrepancies included the booking officer's failure to completely search plaintiff's wallet, and the failure to inventory over half of the money. Id. Additionally, the booking officer placed her own name on one form instead of plaintiff's, the property control sheet did not list plaintiff's watch, and the booking officer failed to give plaintiff a receipt for his property. Id. In view of this evidence of negligence, the court denied the defendant city's motion to dismiss on the ground of sovereign immunity. Id.

Here, the evidence shows that a police protocol exists regarding the recovery of items during a search. Consequently, the inventorying, recording, and storing of these items is ministerial. see, Harris, at 389; Jungerman, at 206. These individual defendants are not shown to have been involved in the processing of the property, however, so the possibility that property disappeared through bad processing or storage is not an issue here; and in any event, as the Jungerman case shows, a ministerial miscarriage presumably results in official liability, not the personal liability of the employee.

Insofar as plaintiffs complain of the taking of the property incident to the raid on the residence, I am satisfied the selection of what should be seized involves an exercise in judgment, and is therefore treated as discretionary as in Charron. [8] The gist of this complaint seems to be that property has not been returned. There is no showing that these officers involved in a seizure have

---

[8] If there was "bad judgment" in picking up the firearms that would by definition, involve an abuse of discretion, which is not actionable under the applicable law.

12

a role in returning property, or the authority to direct that seized property be returned. Thus, summary judgment in favor of defendants is required for the conversion claims.

**D. Battery and Assault**

Pickens asserts a claim of battery against defendants Wood, Farris, Glass, Selock, Ericsson, and Roeder. A battery is committed when a person intentionally does: 1.) An act resulting in bodily contact causing physical pain or injury; or, 2.) An act results in bodily contact which a reasonable person would deem insulting or offensive. Fakorzi v. Dillard's, Inc., 252 F.Supp.2d 819, 834 (S.D.Iowa 2003); see also, Daniels v. Downing, 2003 WL252114 *8 (D.Minn. 2003). While it may be unlawful in given circumstances for a private individual to touch the person of another, it is entirely lawful for an officer clothed with a warrant to do so, provided he or she uses no more force than is reasonably necessary. Washington v. Drug Enforcement Admin., 183 F.3d 868, 874 (8th Cir. 1999). Unreasonable force, however, is an element of an action for battery against a police officer who made a lawful arrest. Daniels, at *8.

Here, the record is silent as to what probable cause, if any, defendants possessed in order to obtain the search warrant, and defendants do not claim possession of information leading to a belief that the occupants were armed and dangerous. On the other hand, plaintiffs do not fashion a claim for unlawful entry. Nonetheless, even if the entry was lawful, Pickens endured physical restraint that allegedly caused pain, and that a reasonable person would find insulting or offensive. It has been held that some use of force by police is reasonable when an arrestee resists. Radloff v. City of Oelwein,

13

284 F.Supp.2d 1145, 1153 (N.D.Iowa 2003). However, here, there is no uncontested evidence that Pickens attempted to resist or flee, or posed a danger to either the officers or others. Coleman v. Rieck, 253 F.Supp.2d 1101, 1106-07 (D.Neb. 2003) [9]. Under the circumstances presented here, a reasonable jury could find that defendants Glass and Selock used unreasonable force if they kicked, punched, and beat Pickens, and that they did so with malice. Daniels, at *8.

**Assault**

Hutchinson asserts a claim of assault against defendants Wood, Farris, Glass, Selock, Ericsson, and Roeder. In support of her claim, Hutchinson contends that the officers unlawfully and unreasonably pointed their guns at her while threatening to shoot her dog which was cowering in fear behind her. Hutchinson further claims that in the event the officers fired their weapons, she feared she would have been shot. According to Hutchinson, she was in apprehension of great bodily harm.

An assault is committed when a person does: (1) an act intended to put another in fear of physical pain or injury; (2) an act intended to put another in fear of physical contact which a reasonable person would deem insulting or offensive; and the victim reasonably believes that the act may be carried out immediately. Fakorzi, 252 F.Supp.2d at 834.

---

[9]See, Phelps v. Coy, 286 F.3d 295, 301 (6th Cir. 2002) (on the facts presented there was no governmental interest in continuing to beat the plaintiff after he was neutralized, and a reasonable officer would not have thought there was); see also, Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir. 2001) (gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment); Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000) (allegations that officers "smacked" suspect while he lay cuffed on the ground assert a violation of the Fourth Amendment).

14

As previously noted, Missouri law permits officers to take appropriate action to ensure their safety while executing search warrants; provided the force is not unreasonably unnecessary. Washington v. Drug Enforcement Admin., 183 F.3d at 874. The government retains a strong interest in allowing law enforcement officers to protect themselves and the citizenry from animal attacks. Altman v. City of High Point, N.C., 330 F.3d 194, 205 (4th Cir. 2003) (officer who shot and killed dogs traveling in a pack and behaving in an aggressive manner was reasonable). Although the plaintiff's claim in Altman was asserted as a Fourth Amendment claim, the reasonableness standard utilized under claims pursuant to § 1983, is equally applicable here under a state claim analysis.

In Warboys v. Proulx, 303 F.Supp.2d 111 (D.Conn. 2004), the court found that the police officer acted reasonably in shooting a 90 to 100 pound pit bull which was demonstrably not able to be restrained by its owner and was quickly approaching the officer. Warboys, at 117. In reaching this conclusion, the court undertook a rather thorough review of the pit bull breed, and found that they possess the quality of *gameness*, which although not a totally clear concept, has been described as the propensity to catch and maul an attacked victim unrelentingly until death occurs, or as the continuing tenacity and tendency to attack repeatedly for the purpose of killing. Warboys, at 119 n. 13. It is clear that the unquantifiable, unpredictable aggressiveness and gameness of pit bulls make them uniquely dangerous. Id.

In viewing the facts in a light most favorable to Hutchinson, it cannot be concluded that the officers acted unreasonably in directing their weapons in the direction of Hutchinson's dog or in conduct that alarmed Hutchinson. Intent to frighten or intimidate her cannot be inferred. Even if alarming, I am satisfied that the conduct was legally protected as it related to her. As such, summary judgment will be granted to defendants on Hutchinson's claim of assault.

15

Accordingly, it is hereby

ORDERED that defendants' motion for summary judgment (ECF doc. 40) is GRANTED in part and DENIED in part, consistent with this opinion as follows:

1.) Count I - Excessive Force (Pickens)

Summary judgment is granted as against defendants Farris, Ericsson, and Roeder, and as against the Board

Summary judgment is denied as against defendants Wood, Glass and Selock

2.) Count II - Conversion (Pickens)

Summary judgment is granted

3.) Count III - Conversion (Hutchinson)

Summary judgment is granted

4.) Count IV - Battery (Pickens)

Summary judgment is denied as against defendants Glass and Selock

5.) Count V - Assault (Hutchinson)

Summary judgment is granted

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

August 7, 2006

Kansas City, Missouri

17